# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | JAMES B. ZAGEL | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2784 | **DATE** | SEP 26 2001 |
| **CASE TITLE** | Levi Nash, #B-01861 vs. George H. Ryan, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] The defendants' motion for leave to file their reply brief instanter is granted. For the reasons set forth in the accompanying Memorandum Opinion and Order, the defendants' motions for summary judgment [nos. 35 and 38] are granted. The Clerk is directed to enter judgment in favor of the remaining defendants and against the plaintiff pursuant to FED. R. CIV. P. 56. The case is terminated. The parties are to bear their own costs. The motion hearing previously scheduled for September 25, 2001, is vacated.

(11) ■ [See attached Memorandum Opinion and Order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | 57 |
| | Copy to judge/magistrate judge. | | |
| mjm | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LEVI NASH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 00 C 2784 |
| v. | ) |
| | ) U.S. District Judge |
| GEORGE DeTELLA, et al., | ) James B. Zagel |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, a state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff claims that the defendants, officials at the Stateville Correctional Center, have violated the plaintiff's constitutional rights by acting with deliberate indifference to his health, safety, and medical needs. More specifically, the plaintiff alleges that the water at the Stateville Correctional Center is contaminated with radium, bacteria, and other contaminants, that the tainted water has adversely affected inmates' health,[1] and that the defendants have failed to make any effort to rectify the problem. This matter is before the court for consideration of the defendants' motion for summary judgment. For the reasons stated in this order, the motion is granted.

The standards that govern this motion are familiar: Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact

---

[1] By Minute Order of May 8, 2001, the court denied the plaintiff's motion for class certification. This case involves only Mr. Nash's personal claims concerning water quality at the Stateville Correctional Center, and not any other inmate.

57

and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mayoral v. Sheahan*, 254 F.3d 934, 938 (7th Cir. 2001). In determining whether factual issues exist, the court must draw all reasonable inferences in the light most favorable to the non-moving party. *Mayoral*, 254 F.3d at 938; *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). If the moving party meets its burden, the responding party must then "come forward with facts 'sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.'" *Celotex*, 477 U.S. at 322; *Langston v. Peters*, 100 F.3d 1235, 1237 (7th Cir. 1996) *quoting Celotex*, 477 U.S. at 322.

## FACTS

The plaintiff is a state prisoner, confined at the Stateville Correctional Center at all times relevant to this action (that is, since about November 1998). (Complaint, pp. 2, 6.) The defendants Donald Snyder and George DeTella are, respectively, the current and former Directors of the Illinois Department of Corrections. (*Id.*, pp. 2, 3.) The defendant James H. Page is the warden of the Stateville Correctional Center. (*Id.*, p.2.) The defendants Donald Gaetz, Jerome Springborn, and Vance Vinson are or were assistant wardens at Stateville. (*Id.*, pp. 2-3.) The defendant Robert Gunville is the facility's chief engineer. (*Id.*, p. 3.) The defendant Barbara Miller is the administrator of Stateville's health care unit. (*Id.*) The defendant Joseph Smith is the prison's medical director. (*Id.*)[2]

---

[2] Pursuant to 28 U.S.C. § 1915(e)(2)(B), the court on its own motion dismissed the complaint as to Governor George Ryan for lack of personal involvement by Minute Order of (continued...)

2

Viewed in the light most favorable to the plaintiff, the record presents the following facts: In accordance with the mandates of the Illinois Environmental Protection Agency, the Stateville Correctional Center generally[3] submits samples of water from three deep ground wells on a quarterly basis. (Defendants' Exhibit 2, Aff. of Stateville Assistant Warden Vance Vinson, ¶ 2.) Samples collected from the wells have concentrations of radium 226 and 228 that exceed the existing maximum allowable concentrations under current standards. (Id., ¶ 6.) Specifically, although the maximum allowable concentration for these combined elements is 5 pico-curies per liter of water, quarterly samples taken at Stateville between 1992 and 2000 indicate levels between 9.5 and 10.6 pico-curies per liter. (See Defendants' Group Exhibit 2, attached to Exhibit 1, Aff. of Roger D. Selburg, manager of the I.E.P.A.'s Division of Public Water Supplies.)[4]

As early as 1993, the E.P.A. proposed new combined maximum contaminant levels of 20 pico-curies each for radium 226 and 228 in water. (Vinson Aff., ¶ 3). Under the proposed

---

[2](...continued)
May 24, 2000. The court granted summary judgment in favor of the defendant American Correctional Association and against the plaintiff by Memorandum Opinion and Order entered September 21, 2000.

[3] On multiple occasions, the prison has failed to submit water samples to the Illinois Environmental Protection Agency's laboratory as required. On such occasions, the prison is then required to make public notification of its noncompliance. (See Plaintiff's unmarked exhibits to his summary judgment brief.)

[4] Neither party has explained the term "pico-curie," but the court notes the following definitions from The American Heritage® Dictionary of the English Language, Third Edition Copyright © 1996, 1992 by Houghton Mifflin Company: "Pico" is a prefix meaning "one-trillionth ($10^{12}$)." "Curie" is a "unit of radioactivity, equal to the amount of a radioactive isotope that decays at the rate of $3.7 \times 10^{10}$ disintegrations per second."

3

guidelines, Stateville's water supply would have been well within maximum standards. (*Id.*) The Illinois E.P.A. has never ordered Stateville to undertake corrective action beyond posting of a public notice about the radium content of the water, and has never directed that Stateville furnish inmates or staff with bottled drinking water. (*Id.*) The prison does, however, provide prison employees with free bottled drinking water. (Plaintiff's Exhibit 3.)

The prescribed notice has been routinely posted in the inmate law library and the staff dining room, and, as of March 4, 2000, in the inmate dining area. (*Id.* ¶ 4; *see also* defendants' Group Exhibit 1 to Vinson's Aff., Warden's Bulletins concerning radium in the water.[5]) The Illinois E.P.A. has accepted the notices as satisfactory. (Vinson Aff. ¶ 5.)

The E.P.A. formalized the combined maximum contaminant levels for radium 226 and 228 on December 7, 2000. (*Id.* ¶ 6.) Although a higher standard had been proposed, the E.P.A. retained the standard of 5 pico-curies per liter of water, to be effective on December 8, 2003. (*Id.*) Now that this 5 pico-curie water standard appears to have been permanently established, Stateville has begun capital developments to bring its water into compliance with that standard

---

[5] In his response to the defendants' uncontested statement of facts, the plaintiff contends that no notices have been posted. In support of his contention, the plaintiff provides numerous unnotarized "affidavits" from fellow prisoners who claim never to have seen notices regarding the high levels of radium in Stateville's water. But the notice requirement does not affect whether the inmates have been exposed to undue risk. The court may grant summary judgment if facts are in dispute, so long as those facts are not outcome determinative. *Matter of Wildman*, 859 F.2d 553, 556 (7th Cir. 1988). Non-compliance with the E.P.A. notice requirement would not itself form a basis for a cause of action under 42 U.S.C. § 1983. Violations of state or federal law are not by themselves constitutional violations. Nor does the prison's occasional failure to submit water samples in a timely manner give rise to a constitutional claim.

4

before the December 8, 2003 deadline, and has requested that funds be budgeted for the necessary improvements. (*Id.* ¶ 7.)

Stateville's water is sampled and monitored for more than eighty other contaminants. (*Id.* ¶ 8.) On November 19, 1999, Stateville received a bacteriological violation notice for a suspected presence of coliforms in the water. (Defendants' Exhibit 2 to Reply Brief, Affidavit of Michael Crumley, Illinois Environmental Protection Agency, ¶ 2.) Coliforms are bacteria that are naturally present in the environment and are used as an indicator that other, potentially harmful bacteria may be present. (*Id.*, ¶ 3.) The presence of coliform does not necessarily mean that there is a health risk with the water. (*Id.*) Coliform contamination can cause gastroenteritis (that is, diarrhea, cramps, nausea and vomiting) but its effects are short-term. (*Id.*, ¶ 4.)

Under IEPA rules, when coliform levels tested high, Stateville was required to perform three follow-up tests to determine whether maximum contaminant levels were exceeded. (*Id.*, ¶ 7.) However, Stateville returned only one sample. (*Id.*, ¶ 8.) Although the repeat sample did not test positive for exceeding maximum contaminant levels, the prison received a violation and the water was automatically considered "positive" for total coliform due to the prison's failure to provide the two other required samples. (*Id.*, ¶ 8, 9.) A positive result for total coliforms at one location of a provider's distribution system does not necessarily mean that the entire water system is contaminated. (*Id.*, ¶ 10.) Water at one point in the system may have a problem while another area may not exceed maximum contaminant levels. (*Id.*) The IEPA did not require any type of correction to the water. (*Id.*, ¶ 11.)

5

Although Stateville has been cited at times for failing to submit test samples in a timely manner, there is no indication that the water was in fact contaminated during those time periods. To the contrary, the Illinois E.P.A. has certified that Stateville's water is in compliance with eighty other water standards other than radium. (*See* Defendants' Exhibit 3, February 8, 1999, letter from Illinois E.P.A. Assistant Manager Lou Allyn Byus to inmate J. Des Roches.)

In addition to Assistant Warden Vinson's affidavit, the defendants have offered the affidavit of Roger D. Selburg, Manager of the Division of Public Water Supplies for the Illinois E.P.A. Mr. Selburg, a registered engineer, is familiar with federal water regulations and findings concerning risk associated with drinking waters. (Defendants' Exhibit 1, Aff. of Roger D. Selburg, Manager of the Division of Public Water Supplies, Illinois E.P.A.) According to Selburg, because the levels of exposure from naturally occurring radium are so much lower than the threshold levels studied by the E.P.A., the risk of bone necrosis and other non-cancer health effects are usually not of concern for radium in drinking water. *Id.*, ¶ 5; *see also* 56 F.R. 33072, column 3 [concerning statistical quantitative estimates of the risk of contracting certain diseases from ingesting radium in drinking water].) Correlations between cancer rates and radium in drinking water in three U.S. studies have been "statistically marginal." (*Id.* ¶ 6.) Based on studies, the estimated risk of contracting cancer corresponding to a lifetime intake of water containing 1 pico-curie of radium 226 per liter of water ranges from 4.4 to 8.4 chances in a million (or about 1 chance in 227,000 or 1 chance in 119,000). (*Id.* ¶¶ 8, 9.) The estimated risk of contracting cancer corresponding to a lifetime intake of water containing 1 pico-curie of

radium 228 per liter of water ranges from 3.8 chances to 8.8 in a million (or approximately 1 chance in 263,000 or 1 in 114,000). (*Id.*)

The E.P.A rates the mortality risk at one chance in 10,000 for the lifetime drinking of two liters per day of water containing radium 226 in the concentration of 22 pico-curies per liter or radium 228 in the concentration of 26 pico-curies per liter. (*Id.* ¶¶ 10, 11; *see also* 56 F.R. 330573, column 3 and 33074, column 1.) This is more than four times the levels found in the drinking water at the Stateville Correctional Center. (*Id.; see also* exhibits attached to Selburg's affidavit.) A "lifetime" estimate is based on seventy years of consumption. (*Id.* ¶ 15.) Thus, the statistical probability that an inmate will contract cancer from drinking water at the Stateville Correctional Center is extremely remote. (*Id.* ¶14.)

According to the National Inorganics and Radionuclides Survey of 1988, parts of the states of Illinois, Wisconsin, Minnesota and Missouri have high levels of radium in the water. (*Id.* ¶ 12.) Approximately six hundred public water supplies contain radium 226 levels in excess of 5 pico-curies per liter; many are expected to have levels exceeding 20 pico-curies of radium 226 per liter of water. (*Id.*) The same NIRS study indicates that approximately 1.3 million people drink water having radium 228 levels in excess of 5 pico-curies per liter. (*Id.*) Some 164,000 people receive water estimated to have levels exceeding 20 pico-curies of radium 228 per liter and approximately 82,000 persons receive water expected to have levels exceeding 30 pico-curies of radium 228 per liter. (*Id.*) Thus, the levels of radium in Stateville's water system, although higher than both Illinois E.P.A and federal E.P.A. standards, "are neither atypical nor unusual compared to the radium levels present in the water supplies furnished to a large segment

of the general population in the Northern Illinois Area." (*Id.* ¶ 16; *see also* Attachment 2 to Selburg's affidavit.)

On each of the three occasions the plaintiff has been transferred to Stateville, he has undergone a full physical examination to determine whether he needed any special medical care. (Nash depo., p. 43.) Beginning in November 1993, the plaintiff has been prescribed medication to treat hypertension. (*Id.*, p. 42.) Despite his fears that he "may be suffering from bone cancer now," the plaintiff has never suffered any injuries or illnesses due to the radium levels in the water at Stateville. (*Id.*, p. 45.) The plaintiff concedes that he has no medical evidence that he is suffering adverse effects from Stateville's water. (*Id.*)

As medical director at Stateville, Smith is responsible for supervising inmate health care. (Defendant Smith's Exhibit B, ¶ 2.) Prior to his promotion in January 2000, Smith was one of the prison's staff physicians and provided direct care to inmates. (*Id.*)

Neither state or federal environmental protection agencies nor Stateville administrators have advised Smith that radium levels in Stateville's drinking water pose a health risk. (*Id.*, ¶ 3.) Smith has no authority to alter or control the water supply at Stateville. (*Id.*, ¶ 4.) In Smith's medical judgment, it is not necessary to provide inmates with periodic medical screenings to determine whether the drinking water at Stateville has caused inmates any adverse health effects. (*Id.*, ¶ 5.)

Smith has never denied the plaintiff care or treatment. (*Id.*, ¶ 9.) Correctional medical technicians made rounds in the cell houses every day. (*Id.*, ¶ 8.) An inmate may request to be evaluated by a CMT; the CMT will then notify a nurse or doctor if he finds that the inmate needs

further medical care. (*Id.*; Nash deposition, pp. 37-38.) The plaintiff has never complained to Smith about any medical problems caused by the levels of radium in the water at Stateville. (*Id.*, ¶ 9.)

## DISCUSSION

As discussed in the court's Memorandum Opinion and Order of September 21, 2000, the Eighth Amendment prohibits deliberate indifference to inmates' health, safety, and medical needs. Failure to take reasonable measures in the face of a substantial risk of serious harm violates the Constitution. *Farmer v. Brennan*, 511 U.S. 825, 845 (1994). In order to establish Eighth Amendment liability, a plaintiff must meet two requirements: first, he must show that the challenged conditions of confinement were objectively so serious as to amount to the denial of a basic human need; second, he must show that the defendant official acted with deliberate indifference. *Id.* at 834. As the Court of Appeals has explained, "the Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner, but only to that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). In this case, the plaintiff has satisfied neither the objective nor the subjective prong.

In fact, the U.S. Court of Appeals for this circuit recently held that complaints about radium in Stateville's water do not implicate the Eighth Amendment. *See Carroll v. DeTella*, 255 F.3d 470 (7th Cir. Jul. 3, 2001).

> Poisoning the prison water supply or deliberately inducing cancer in a prisoner would be forms of cruel and unusual punishment, and might be even if the harm was probabilistic or future rather than certain and immediate. But failing to provide a maximally safe environment, one completely free from pollution or

9

safety hazards, is not.... Many Americans live under conditions of exposure to various contaminants. The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans. It would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures.

*Carroll*, 255 F.3d at 472-73 (internal citations omitted).

**No Evidence of a Substantial Risk of Serious Harm**

First, the plaintiff offers no evidence that he faces a substantial risk of serious harm. Some medical studies suggest that the long-term consumption of water containing radium may slightly increase one's odds of developing cancer. The record here shows, however, that the risk is sufficiently minimal that the state and federal environmental protection agencies: (1) debated for almost ten years whether to raise maximum standards significantly; (2) permitted Stateville to take no corrective action while the rates were in flux; and (3) imposed a three-year deadline for bringing public water supplies into compliance. So far as current studies show, exposure to radium at the levels present at Stateville do not pose an excessive risk to the plaintiff's health. As noted, the E.P.A. estimates the mortality risk at one in 10,000 for persons drinking two liters per day of water containing radium four and five times the level of that found in the water at Stateville. The statistical probability of the plaintiff contracting cancer from Stateville's water is simply too remote to implicate constitutional concern, and he has offered no evidence that radium is linked with any health concern other than cancer.

As noted above, there is no evidence that Stateville inmates face any greater risk than the general population in the surrounding geographical area, indeed much of the Midwest.

10

According to the E.P.A., parts of Illinois, Wisconsin, Minnesota and Missouri all have elevated levels of radium in the water. Simply put, the potential problems generated by radium concentrations of this level are risks that society chooses to tolerate. *Cf. Henderson v. Sheahan*, 196 F.3d 839, 847 (7th Cir.), *cert. denied*, ___ U.S. ___, 120 S.Ct. 2691 (2000) (objective inquiry into claim by inmate complaining of exposure to second-hand smoke required more than just a "scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS," it also required that the inmate show "that the risk of which he complains is not one that today's society chooses to tolerate." *See also McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993) (upholding dismissal of an inmate's claim that his placement near asbestos-covered pipes violated his Eighth Amendment rights where the plaintiff failed to prove that he was exposed to unreasonably high levels of asbestos).

In *McNeil*, the Court of Appeals noted, "[I]t is unfortunate, but the fact remains that asbestos abounds in many public buildings. Exposure to moderate levels of asbestos is a common fact of contemporary life and cannot, under contemporary standards, be considered cruel and unusual." 16 F.3d at 125. Likewise, the presence of naturally occurring, trace amounts of radium in the water is a fact of life in much of the Midwest, for prisoners and free citizens alike. Radium in the water may have the slight potential to cause harm after many years, but this case does not involve the "substantial" risk of serious harm necessary for Eighth Amendment liability.

In his complaint, the plaintiff additionally asserts that besides radium, Stateville's water is also contaminated with "bacteria and other contaminants." The plaintiff has offered no

11

evidence of any kind in support of that allegation, however. To the contrary, the Illinois E.P.A. has confirmed that Stateville meets public safety water standards in all other respects: "Water from Stateville is routinely monitored for approximately eighty other parameters, and the water is in compliance with these standards, including the lead standard." (Defendants' Exhibit 3.) Notwithstanding the prison's failure to submit monitoring reports on multiple occasion, the plaintiff has failed to make a triable showing that the drinking water at Stateville places him at undue risk of harm.

The plaintiff's suggestion that the water has already caused harm is likewise wholly unsupported by the evidence and insufficient to defeat summary judgment. The plaintiff attributes "rashes, hypertension, eczema, psoriasis, skin discoloration, nausea, anxiety, depression, breathing disorders, diarrhea, constipation "and other forms of cancer" to the water. But unsupported statements in a brief are not evidence and cannot be given any weight. *See, e.g., In the Matter of Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985).

The court's summary judgment instructions, which were sent to the plaintiff on February 26, 2001, specifically noted that every factual statement must be accompanied by a citation to the record indicating the evidence that supports that factual proposition. The plaintiff has submitted no evidence such as medical records that shows either that he suffers those complaints or that they are water-related. To the contrary, the plaintiff conceded at his deposition that he had no medical complaints he could attribute to the water, despite his subject (but unsubstantiated) fear that he may have bone cancer. *See* Nash deposition at p. 45. A party may not create issues of credibility by contradicting his own earlier, sworn testimony. *See e.g.*,

*Lucien v. Gramley*, 99 F.3d 1142 (Table, Text in WESTLAW), 1996 WL 590539, at *4 (7th Cir. 1996); *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168-69 (7th Cir. 1996), citing *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985). The plaintiff has produced no medical evidence or any other authority to support his position that three years of drinking Stateville's water has caused health problems. The literature in the record suggests that radium may possibly cause cancer after long-term consumption, but not the conditions attributed to the water by the plaintiff, and not after such a short time period. The court concludes that the plaintiff's perceived ailments, however serious they may be, are unrelated to the drinking water at Stateville.

**No Evidence That The Defendants Were Deliberately Indifferent**

Even if the plaintiff had presented evidence that radium in the water exposes him to an excessive risk of harm, the court concludes that the defendants would nevertheless be entitled to summary judgment because there is no evidence that they were deliberately indifferent to a substantial risk of serious harm to the plaintiff. "The infliction must be deliberate or otherwise reckless in the criminal law sense, which means that the defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant actually knew of an impending harm easily preventable." *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996). "Liability under the Eighth Amendment requires punishment, and punishment requires more than negligence, whether ordinary or gross. It requires, at a minimum, that the prison officials have realized there was imminent danger and have refused--consciously refused, knowingly refused--to do anything about it." *Campbell v. Greer*, 831 F.2d 700, 702 (7th Cir.

1987) (citing *Whitley v. Albers*, 475 U.S. 312 (1986)). "If the harm is remote rather than immediate, or the officials don't know about it or can't do anything about it, the subjective component is not established and the suit fails." *Del Raine v. Williford*, 32 F.3d 1024, 1038 (7th Cir. 1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 301 (1991)).

In this case, deliberate indifference cannot be attributed to the defendants since even the state and federal environmental protection agencies--the governmental bureaucracies that oversee such health concerns--required no action. As early as 1993, the E.P.A. proposed new combined maximum contaminant levels of twenty pico-curies each for radium 226 and radium 228 in water. Under those proposed guidelines, Stateville's water would have been well within compliance with government regulations. Accordingly, the Illinois E.P.A. did not require Stateville to undertake any corrective action. Nor was the prison required to provide staff or inmates with bottled drinking water.

Under the latest rules, formalized on December 7, 2000, the combined maximum contaminant levels for radium 226 and 228 remain at 5 pico-curies per liter of water. The new rule does not become effective until December 8, 1993--further indication that current radium levels do not constitute an urgent health crisis. Stateville administrators have deferred to the expertise of the state and federal environmental protection agencies, and have complied with all directives from those agencies. As Assistant Warden Vinson explained, Stateville has begun capital developments to bring the radium levels in the water into compliance with the standard before the imposed deadline. The defendants' reliance on guidance from the agencies charged with protecting public health, and their implementation of a plan to minimize radium in the

drinking water, defeat any suggestion that correctional officials have acted with deliberate indifference to the safety of inmates.

**No Personal Involvement on the Part of Defendant Smith**

In addition to the factors set forth above, Defendant Smith is entitled to judgment as a matter of law because he lacks personal involvement in water quality issues. To be held liable under the Civil Rights Act, a defendant generally must have direct, personal involvement in the events giving rise to the lawsuit. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). The doctrine of *respondeat superior* (blanket supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992). To be held liable under the Civil Rights Act, a defendant "must know about the [constitutional violation] and facilitate it, approve it, condone it, or turn a blind eye...." *Gentry*, 65 F.3d at 561 (citations omitted).

As Medical Director at Stateville, Smith is not authorized or empowered to direct the Stateville administration to make any health-related capital improvements to the facility. (Smith affidavit, ¶¶ 2, 4, 5.) The plaintiff never complained to Smith about any medical problems he believed to be associated with Stateville's water. (Nash depo., p. 45.) Because the plaintiff has failed to show that Smith was personally involved in the alleged circumstances giving rise to the complaint, Smith is entitled to judgment as a matter of law.

**Qualified Immunity**

Finally, even assuming for purposes of argument that the defendants' conduct did violate the plaintiff's constitutional rights, the court finds that they are entitled to qualified immunity.

15

Under the doctrine of qualified immunity, state officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To evaluate a claim of qualified immunity, the court must engage in a two-step analysis. First, the court determines whether the plaintiff's claim states a violation of his constitutional rights. The court then determines whether those rights were clearly established at the time the alleged violation occurred. *See Wilson*, 526 U.S. at 609; *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1013 (7th Cir. 1997). Only if the rights were clearly established may the official be liable for monetary damages. *See Richardson v. McKnight*, 521 U.S. 399, 403 (1997)

A clearly established right is one where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. "Because there is an almost infinite variety of factual scenarios that may be brought into the courtroom, a plaintiff need not point to cases that are identical to the presently alleged constitutional violation." *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). Nevertheless, an official will not be individually liable unless "the contours of the right . . . have been established so that the unlawfulness of the defendant's conduct would have been apparent in light of existing law." *Id., citing Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430 (7th Cir. 1989), *cert. denied*, 498 U.S. 949 (1990).

The court is satisfied that the defendants are entitled to qualified immunity because water standards have been in flux and because the state and federal environmental protection agencies

required no corrective action. While inmates are plainly entitled to safe food and water, the defendants properly relied on directives from the E.P.A. water experts, both in assessing the risk to inmates posed by the water and in determining what action needed to be taken. Even if the record supported a finding that Stateville's water had exposed the plaintiff to an intolerable risk of harm (which it does not), the court concludes the defendants have acted in good faith. The defendants' conduct has not been plainly illegal or wrongful. The defendants are therefore entitled to qualified immunity.

## CONCLUSION

Even viewing the evidence in the light most favorable to the plaintiff, no reasonable person could find either that the plaintiff faces an unreasonable risk of harm from drinking Stateville's water or that the defendants have acted with callous indifference to that risk. Defendant Smith had no personal involvement in creating (or failing to correct) any risk relating to drinking water. Moreover, all of the defendants are entitled to qualified immunity because they have violated no clearly established rights. For all of these reasons, the defendants' motions for summary judgment must be granted.

If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within thirty days of the entry of judgment. FED. R. APP. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C); *Hyche v. Christensen*, 170 F.3d 769, 771 (7th Cir. 1999). If the plaintiff does choose to appeal, he will be liable for the $105 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Illinois Dept. of Corrections*, 150 F.3d 810, 812 (7th Cir.

1998). Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a P.L.R.A. "strike." The plaintiff is warned that if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury. 28 U.S.C. § 1915(g).

IT IS THEREFORE ORDERED that the defendants' motions for summary judgment (docket numbers 35 and 38) are granted. The Clerk is directed to enter judgment in favor of the remaining defendants and against the plaintiff pursuant to FED. R. CIV. P. 56. The case is terminated. The parties are to bear their own costs.

ENTER:

Dated: SEP 2 6 2001

JAMES B. ZAGEL
United States District Judge